J-A24021-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| NANCY ADAMS AND DOUG REED | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellants | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAVID J. MILLER AND FREEMAN | : | No. 192 WDA 2020 |
| MILLER D/B/A D&F LUMBER & | : | |
| LOGGING | : | |

Appeal from the Order Entered January 7, 2020
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
Case No. 156-2017 C.D.

BEFORE:  BENDER, P.J.E., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY McLAUGHLIN, J.:            FILED JANUARY 15, 2021

Nancy Adams and Doug Reed (collectively, "Appellants") appeal from the order denying their request for injunctive relief against David J. Miller and Freeman Miller D/B/A D&F Lumber & Logging ("D&F Lumber"). We decline to transfer the case to the Commonwealth Court, and will not quash the appeal for failure to file post-trial motions. Upon consideration of the merits of the appeal, we affirm the trial court's order.

Appellants, who are husband and wife, own a farm on Pike Road, which is a dirt road running east-west in Henderson Township, Jefferson County. Their property is located next to two sawmills, the Hickory Hill Hardwoods, LLC ("H3 Mill") and the D&F Lumber Mill ("the D&F Mill"). D&F Lumber now owns both mills. The mills are on either side of Pike Road, with the H3 Mill on the north side and the D&F Mill on the south. Trial Court Opinion, filed Jan. 7,

2020, at 2. "Their eastern boundaries abut [Appellants'] western boundary." Id.[1] The H3 Mill burned to the ground prior to 2010 and was the property of Lester Byler from 2010 to 2012. During that time, there was no mill on the property, but rather only an office trailer. Id. Byler rebuilt the mill using the existing concrete slab. Id. After he finished rebuilding, "the chipper building and approximately 30 feet of the grader building were the only portions of structure not built on the original slab." Id. In May 2018, Byler sold the H3 Mill to D&F Lumber. Id.

The land underlying the mills was under heavy excavation in 2012 to accommodate construction of the mills and supporting facilities. Id. Although construction of the D&F Mill lagged behind the rebuilding of the H3 Mill, both sawmills were operational and running at their peak by 2014. Id. They operated at full capacity from 7:00 a.m. to 3:30 p.m. every day for the next few years. Id. However, after D&F Lumber acquired the H3 Mill, it operated only one band saw in a building approximately 700 feet west of Appellants' residence. Id. The mills generate large quantities of wood dust that is blown directly into a designated building, or "dust bin." Id.

In February 2017, Appellants filed a civil complaint asserting four causes of action – private nuisance, water trespass, negligence, and violations of the

---

[1] The trial court found Appellants' "residence sits approximately 300 feet east of that boundary on the H3 side of Pike Road." Trial Ct. Op. at 2. "The D&F [M]ill sits nearer to the parties' shared boundary but, given its more southerly position, appears to be approximately the same distance from [Appellants'] home as the H3 [M]ill." Id.

- 2 -

Stormwater Management Act. Appellants alleged that the sawmills were discharging water, wood dust, and other pollutants, and that the discharge was causing damage to Appellants' property and to their health. As relief, the Complaint sought both a permanent injunction and money damages.

More than two years after the filing of the Complaint, in June 2019, Appellants filed a petition for a preliminary injunction. They maintained that Appellant Doug Reed suffered from bronchial spasms and, according to expert opinion, the condition was caused by "sawmill pollutants" and would continue to worsen until D&F Lumber remediated conditions at the sawmill properties. Plaintiffs' Petition for Injunctive Relief, filed June 28, 2019, at 3-4. The court scheduled a hearing, but Appellants discontinued the petition without prejudice, citing their expert's unavailability on the hearing date. See Order, filed July 12, 2019; Motion to Discontinue Petition and/or Continue Hearing, filed July 12, 2019.

A few weeks later, in August 2019, Appellants refiled their petition for a preliminary injunction. The court again scheduled a hearing, but postponed it because neither party was ready and discovery was outstanding. After a status conference, although Appellants had petitioned for a preliminary injunction, the court set a hearing for December 2019 for a "permanent injunction." Order, filed Sept. 5, 2019. It also set deadlines for the exchange of expert reports and the filing of "pre-trial statements." Id. Appellants filed a "pre-trial statement" stating that the December hearing concerned the request for

injunctive relief, not damages, and, therefore, they would not present evidence of damages. Plaintiffs' Pretrial Statement, filed Nov. 19, 2019, at 5.

At the December 2019 hearing, D&F Lumber objected to the testimony of Appellants' expert, Lake Randall, claiming the expert was to testify as to stormwater, and stating, "This is a preliminary injunction on dust. . . ." N.T, 12/9/2019, at 5-8. Appellants responded that, because the court had designated the hearing as being on the request for a permanent injunction, the court should allow the witness to testify. Id. The court overruled the objection.

Appellants then presented the testimony of an expert in pulmonology, John Penek, M.D. N.T., 12/9/19, at 14. He testified that it was his opinion that "there's significant chronic exposure to various dust and pollutants that have negatively impacted [Reed's] respiratory function." Id. at 15. He said that "[w]ood dust is clinically toxic and is associated with various abnormal respiratory functions including allergic alveolitis, inflammation of the alveoli, [and] chronic obstructive lung disease." Id. He also said that there "is a relationship between wood dust and the development of lung cancer and other chronic respiratory disorders." Id. Dr. Penek said he had spoken with Reed and reviewed Reed's medical history, and that Reed "has chronic obstructive lung disease, some restrictive lung disease, [and] sleep apnea, which [was] a weight[-]related issue and not directly related to exposure." Id. at 17-19. Dr. Penek also said that a pulmonary function test had shown mild restrictive lung disease and obstructive lung disease. Id. at 20-21. Dr. Penek testified that,

in his opinion, the source of Reed's ailments was "allergic alveolitis [and] allergic pneumonitis associated with the inhalation of sawdust." Id. at 21-22.

On cross-examination, Dr. Penek stated he had not looked at Reed's medical records from more than five years before the hearing, and conceded that Reed had been treated for his condition for longer than five years. Id. at 31. Dr. Penek also admitted that he did not know whether his opinion would change if there was no dust or very little dust from D&F Lumber's property. Id. at 34-35. He further testified that Reed still would have his pulmonary problems if the sawmills stopped operation, but "in a decreasing amount." Id. at 35. He also acknowledged that Reed worked as an excavator, which involved exposure to dust. Id. at 39. He agreed that Reed worked as a farmer and grew hay, and that "farmer's lung" is "an allergic pneumonitis or alveolitis as a result of moldy hay." Id. at 40. Dr. Penek reiterated, however, that he "believe[d] the sawdust contributed to [Reed's condition] significantly" because the issue was "multifactorial, some of which is sawdust, some of which is road dust." Id. at 41, 44.

Regarding the sources of the dust, counsel for D&F Lumber asked Dr. Penek, "You don't know what is causing it. You have done no testing to determine what is causing it, correct? You're missing the causation, aren't you?" Dr. Penek answered, "Yes." Id. at 48. On re-direct, Dr. Penek testified that his understanding of the sources of dust came from Reed. Id. at 57.

Appellants also presented Randall, as an expert in civil engineering and hydrology. Randall testified that he had investigated Appellants' property, and

the water flowing to it, on three occasions. He concluded that D&F Lumber "increased the stormwater peak rate, volume and velocity that leaves [its] site, and as a result, there are impacts, and the impacts aren't mitigated." Id. at 78. He testified that D&F Lumber's stormwater controls were not compliant with township ordinances or Pennsylvania Department of Environmental Protection ("DEP") standards. Id. at 85. He further testified that he was on Appellants' property on two occasions "to see the dust clouds." Id.

On cross-examination, he agreed that many of his photographs contained no dust clouds, and that one of the photographs with a dust cloud showed the dust coming from the dirt road. Id. at 93-94. He further agreed that the other photograph of a dust cloud showed a truck causing the dirt or dust on the township road. Id. at 96. He stated that D&F Lumber "would be required to do the dust control even on the township road." Id. at 95. Randall further testified that he completed his report in 2018, and was not aware of anything that occurred at or near the site since that time. Id. at 98-99. He testified that it was "very clearly the truth" that the DEP and the township had allowed the construction to happen even though it was not within the regulations and ordinances. Id. at 101.

Appellant Nancy Adams testified that she moved to the property in 1996. She said that at the time, there was an operational sawmill on the site that the H3 Mill now occupies, but that it had burned to the ground in 2000. Id. at 139-40. She stated that after Lester Byler bought the H3 Mill, it became "an industrial park with heavy machinery, numerous buildings, all kinds of

construction, constant construction and excavation." Id. at 142-43. She stated the "water [came] from all directions" after the owners "elevat[ed] and excavat[ed] and put[] buildings up." Id. at 143. She described the effect the water had on her property, including that she gets water in the basement of her house and pooling in the pasture. Id. at 145-47.

She also testified about the sawdust, stating it was "so bad" and the wind always blows the sawdust in their direction. Id. at 150. She said that the "sawdust is usually through the roof," "you can walk outside and feel it hitting you in the face," and it is "all over the cars." Id. at 150-51. She stated it is "all through [her] house. It's in the cupboards. It's in [her] closets. It's everywhere." Id. at 151. She testified that as many as "fifty [trucks] a day" traveled the road from the sawmill. Id. at 157. She further testified that she saw a DEP investigator, Justin Rogers, outside her house, and invited him in, but that he never collected a sample of the dust from her mantel for testing. Id. at 217.

Reed testified that he has lived with his wife Nancy Adams at the Pike Road farm since 2009. Id. at 219. He testified that he does the farming on the property, including making hay and caring for the cattle. Id. He testified that he also has a job running heavy equipment for an excavating company. Id. at 220. He said he started having problems with breathing in July 2011, which was when he started using an inhaler following "two serious attacks." Id. He testified he does not have attacks while farming and that both his farm equipment and his work equipment have closed cabs with filtered air

conditioning. Id. at 221. On cross-examination, Reed stated that he might open the windows on the machinery to get fresh air when there is no dust. Id. at 235. However, he said his breathing attacks were "definitely from" the sawmills. Id. at 235-36. He conceded that at his deposition, he had testified that the dust came from both the mills and the road. He testified at the hearing, "It comes from the sawmills and off the road or both. That's fine, but there was no trucks during my attack." Id. at 236.

D&F Lumber also called witnesses to testify. It first presented the testimony of Henderson Township Supervisor, Harold Pifer. Pifer said that at an April 2016 meeting, Adams expressed her concern about a drainage pipe the township planned to install in a "ditch line," or culvert. Id. at 276-77. He testified that the water was coming out of Adams' property and going down the ditch line, and the township planned to install an underdrain to carry the water to where it could be "relieved without soaking up the road." Id. at 277. He said they were trying to fix Pike Road at Adams' request, and the pipe was intended to keep water from a spring on her property from running onto the township road. Id.

Pifer further testified that he understood that the DEP had been at D&F Lumber's property due to trouble with the sawdust bins and water run-off. Id. at 280-81. He said he understood that they had fixed the bins, and there had not been any trouble since then, in the last year or two. Id. at 281-82. Pifer further testified that the DEP had asked D&F Lumber to install a holding pond for stormwater management on one side of the mill, and D&F Lumber had

complied. Id. at 283. Pifer testified that D&F Lumber was in compliance with the stormwater management ordinance. Id. at 286.

Henderson Township Solicitor, Carl J. Zwick, Esq., testified next. He testified that he had reviewed material regarding D&F Lumber's compliance with the township's stormwater management ordinance. He said he found D&F lumber had always been in compliance, and had drafted a letter stating so. Id. at 297.

The secretary and treasurer of the Henderson Township Supervisors, Ruth Reitz, also testified. She testified that Adams had made multiple complaints about D&F Lumber's property, and that the complaints were investigated. Id. at 306-07. She further testified that D&F Lumber was in compliance with the stormwater management ordinance. Id. at 310.

An inspector with the DEP Air Quality Program, Justin Rogers, also testified. He said he collected a dust sample from a mantel inside of Appellants' house, and had followed DEP's procedures for collecting and labeling the sample. Id. at 315-17. He said the test result revealed that the sample was cotton and paper fibers, not sawdust. Id. at 317. Rogers testified that the testing had been pre-arranged with Appellants. Id. at 318. He explained that he had conducted several investigations of D&F Lumber's sawmills over several years, and had been at the location about 15 times, but had never seen a "big ball" of sawdust rising from the dust bins. Id. at 315, 320. Rogers testified that he did find some violations when investigating D&F Lumber, and D&F Lumber corrected them promptly. Id. at 323. He further testified that on

one occasion he did see saw dust escape the front of the building, but it did not blow toward Appellants' property. Id. at 324.

D&F Lumber also presented the testimony of the district manager for the Jefferson County Conservation District, Shaun Wassell. He explained that the Conservation District "helps conserve and protect resources in the county." Id. at 330. He said the Conservation District had received complaints from Appellants and he, or someone in his department, investigated. Id. at 331-32. He said that they instructed D&F Lumber to make corrections, which D&F Lumber made. Id. at 332.

A water quality specialist for the Commonwealth, Clint Stonesifer, testified that he had gone to the D&F Lumber property after receiving complaints from a neighboring property. Id. at 343. He stated, "It looked to me like most of the water was coming from the township road at the time." Id. He said it was possible the sawmills could have been adding to the water, but most was coming from the road. Id. He testified that in August 2019, D&F Lumber was in compliance with DEP requirements. Id. at 349.

In addition, D&F Lumber called the former owner of the H3 Mill, Lester Byler, to testify. He said he bought the mill in 2010. Id. at 370. He guessed that six to ten trucks went to each lumber mill every day. Id. at 360-61. He did not recall ever seeing sawdust leave the premises. Id. at 361. He said that the DEP did ask him in 2016 to put foam in cracks in the sawdust bins and to place a curtain on the ends, and he did so. Id.

One of D&F Lumber's owners, Freeman Miller, also testified. He testified that when the trucks are unloading, dust can blow off from it, but it is not something that happened regularly, and that trucks now come to a different part of the mill away from Appellants' property. Id. 391-92. He further testified they paid to have the roadway oiled and chipped. Id. at 394.

Following the hearing, the court made the following factual findings, largely rejecting Appellants' evidence:

> 8. The mills generate large quantities of wood dust that is blown directly into a designated building, or "dust bin." When that bin was damaged in 2016, a significant quantity of the dust escaped. See Exh. 12, photo 6. That condition was soon rectified in accordance with DEP recommendations, however, pursuant to which the bin was sealed and curtained.
>
> 9. The wood dust was sold to farmers and pellet mills and hauled away in pick-up and tractor-trailer trucks. The proceeds went to John Gould, as did the money from wood chip and bark sales, as payment for use of his chipper, debarker, and high lift.
>
> 10. When sawdust is being loaded into the trucks, some of it is released into the air. To reduce the potential of the dust affecting the [Appellants], however, the trucks are loaded as far from the [Appellants'] Property as possible.
>
> 11. Vehicles approaching the mills from the east travel past the [Appellants'] house and proceed up a hill. By the time they reach the H3 [M]ill, they are on a downslope that, if followed farther, leads to more residential properties.
>
> 12. When both mills were operating at their peak, as many as 25 commercial trucks drove past [Appellants'] residence each day to conduct business at the mills.
>
> > [1] [Appellants] set the number at 25-50 per day, while Mr. Byler indicated that 6-8, but sometimes more, visited each mill on any given day. [Appellants'] clear

tendency to exaggerate made the former unbelievable, while 25 total adds a conservative cushion to the latter, thereby accounting for "sometimes more."

13. Traffic from passenger vehicles is also heavier during hours of operation.

14. Pike Road is a dirt road that becomes dry and generates significant amounts of airborne dust, some of which pollutes the air and surfaces around [Appellants'] home.

15. In accordance with a schedule dictated by the Township, D&F pays to have Pike Road oiled and chipped. This is only a temporary solution, though.

16. Although the Township requires the mills to bond Pike Road and pay for it to be oiled and chipped, it is ultimately the Township's responsibility to maintain it.

17. Mr. Reed, who grew up on a dairy farm, moved to the [Appellants'] Property in 2009 and began casually farming it. To that end, he raises a few head of beef cattle and grows and harvests hay.

18. Exposure related to the mobilization of moldy hay can result in "Farmer's Lung."

19. Mr. Reed's income derives from his employment as an excavator—an occupation that has exposed him to varying amounts of ambient dust for more than 40 years.

20. In July of 2011, Mr. Reed experienced two severe respiratory attacks, after which he began to use an inhaler. He now uses two bronchial inhalers and takes medication to manage chronic lung disease. His condition is exacerbated by sleep apnea, which Dr. P[e]nek attributes to the weight gain Mr. Reed has realized on account of having to be on steroids.

21. Mr. Reed's initial report to Dr. P[e]nek was that his "work environment and home environment" were causing his problems, and the doctor's official opinion was that "wood dust, mold, and other environmental pollutants" were causing his "significant medical issues." When he testified, however, Dr. P[e]nek excluded all but the wood dust emanating from the defendant sawmills as notable

contributors. Relying to an unreasonable degree on the literature that linked pulmonary diseases with the inhalation of wood dust, he made no mention of mold and would not discuss how "other environmental factors" could or could not change the equation or how his opinion might be affected if conditions were different than he believed them to be.

22. Mr. Reed likewise concluded that his breathing issues could be traced to the sawdust and nothing else. Though at his deposition he identified both the sawdust and road dust as irritants, he testified at the hearing that it was "definitely" and solely the "fugitive dust off the saws" that was causing his problems. Confronted with his deposition testimony, he qualified that he had only had an allergic reaction to the sawdust. He further insisted that his excavation work was not an issue since he was always in a sealed cab.[2]

> [2] Mr. Reed added that be sometimes opened the cab windows to get fresh air when the weather was nice but said he only did so when his work was not generating a lot of dust.

23. The offending dust, according to Mr. Reed, rose up from the sawmills and formed a massive dust cloud that travelled eastward and alighted on the [Appellants] Property whenever the sun was shining and the winds were blowing out of the west. Such a dust event could be seen from a mile away, he testified, and could be precipitated by a tractor-trailer or even a fast-moving car coming down the hill[.]

24. Though its progress could be slowed, Mr. Reed's chronic, progressive, and irreversible lung condition will continue to worsen even if he reduces his exposure to dust and other irritants.

25. Lake Randall, a professional engineer, was at the mill site and [Appellants'] Property on multiple occasions in 2017 to complete an impact study related to stormwater runoff, erosion, and related impacts. He twice saw what he described as dust clouds around the mills. Justin Rogers, a DEP inspector sent to investigate multiple complaints of dust leaving the sawmill properties, was there approximately 15 times and never witnessed such an occurrence.

26. Mr. Rogers did note a few situations that could lead to sawdust migration if not addressed. None warranted an

immediate finding that either [sawmill] was in violation of DEP regulations, though, and because the owners implemented his preemptive suggestions each time, no violation was forthcoming.

27. On one occasion, Mr. Rogers responded to Ms. Adams' complaint by collecting a dust sample from a mantel in her home. The DEP lab report indicated that it was comprised of cotton and paper fibers rather than the sawdust Ms. Adams professed it to be.

28. As is evident from Exhibits 8 & 9, there are times when mill operations generate a lot of dust, but one cannot ascertain from the photographs alone whether it comes from Pike Road as vehicles travel to and from the mills or from the mills themselves as they process timber.

29. Ms. Adams expressed her view of the dust's origins during her testimony. With limited exceptions, however, the Court does not deem her to be a reliable source of information.

30. In addition to the allegedly migrating dust, Ms. Adams has lodged numerous complaints regarding the mills' alleged non-compliance with Township and DEP requirements for stormwater management. In failing to comply, she says, they are discharging large amounts of water onto her property, which has caused flooding, water contamination, irremediable mold, and related problems.

31. The Township investigated Ms. Adams' water-related complaints as they came in and concluded each time that the mills were in compliance with its Ordinance. See e.g., Exhs. 27. That was also its solicitor's conclusion. See Exh. 61.

32. Speaking through Inspectors Shaun Wessell and Clint Stonesifer, the Jefferson County Conservation District and DEP similarly concluded on multiple occasions that the mills' practices satisfied DEP standards. See e.g., Exhs. 21, 21, 30, 37, 38, 40 & 63. Although both [sawmills] belatedly applied for National Pollutant Discharge Elimination System permits, therefore, both were issued permits and have remained in good standing with the DEP.

33. A water quality specialist, Mr. Stonesifer concluded that most of the offending water emanated from Pike Road, not the mills. See Exh. 40. That observation coincided with measures the Township had taken to keep Pike Road clear of water being emitted from a spring on [Appellants'] Property. See Exh. 51.

34. As had Mr. Rogers with respect to the sawdust, Mr. Stonesifer offered suggestions for more effective stormwater containment. [The sawmills] implemented every suggestion, on account of which Mr. Stonesifer never found them to be in violation of DEP regulations. He concluded, moreover, that the abatement measures they had taken were adequate under the circumstances.

35. Mr. Randall disagreed with Mssrs. Wessel and Stonesifer, as well as the Township. The water flooding the [Appellants'] Property, he said, was clearly coming from the mills, whose purported best management practices were not permissible or effective long-term solutions for stormwater management. [The sawmills], he opined, were in violation of DEP requirements and the Township's Ordinance. Both authorities, he said, were simply not enforcing their standards.

36. Ms. Adams and Mr. Reed concurred with their expert's conclusions in that regard. Whereas Mr. Randall declined to speculate on the DEP and Township's reasons, however, [Appellants] expressed their belief that both authorities continued to overlook the defendants' violations because it was financially advantageous to do so.

Trial Ct. Op. at 2-3.[2]

The trial court concluded that Appellants had failed to establish a clear right to relief and entered an order denying the "petition for injunctive relief." Order, filed Jan. 7, 2020. Appellants filed this timely appeal.

_____

[2] The parties also presented testimony about "smoking" piles of wood and noise, and the court found that Appellants' failed to prove either was a nuisance. Appellants do not challenge these findings on appeal.

- 15 -

This Court issued a Rule to Show Cause, directing Appellants to explain why the Court should not transfer this appeal to the Commonwealth Court. Order, filed Feb. 2, 26, 2020. We noted that the appeal was "from an order dealing with an action raising issues related to a municipal ordinance, Henderson Township, and a regulatory authority (the Department of Environmental Protection)." Id. Appellants filed a response to the Rule to Show Cause, and this Court discharged the Rule and allowed the appeal to proceed, but informed the parties that the merits panel could revisit the issue. Order, filed Mar. 16, 2020.

D&F Lumber then filed a motion to dismiss, arguing Appellants failed to preserve their issues because they did not file post-trial motions. This Court denied the motion without prejudice, stating D&F Lumber could raise the issue in its brief. Order, filed Mar. 17, 2020.

Appellants' brief raises the following issues:

> A. Is retention of an appeal in a case involving the application of local ordinances by the Superior Court appropriate where the appeal involves only nuisance and common law claims for equitable relief between private, nongovernmental parties, and where no objection to this Court's exercise of jurisdiction by [D&F Lumber] perfects this Court's jurisdiction pursuant to Pa. R.A.P. 741(a)?
>
> B. Is dismissal of an appeal for a lack of post-trial motions practice pursuant to Pa R.C.P. 227.1 inappropriate where the appealed-from order involved purely claims for injunctive relief, was not entered following a "trial" of all issues, and legal claims for relief remain outstanding following the appealed-from order?
>
> C. Was the trial court's denial of injunctive relief improper where:

- 16 -

> 1. The testimony and evidence establishing [D&F Lumber's] sawmill facilities' stormwater trespasses and nuisances is unrebutted, clear, and credible by the manifest weight of the evidence?
>
> 2. The testimony and evidence establishing the health and property impacts of [D&F Lumber's] sawmill facilities' air pollution nuisances is unrebutted, clear, and credible by the manifest weight of the evidence?
>
> 3. The court, in denying injunctive relief for common law nuisances and trespasses, relies on a regulatory authority's determination that [D&F Lumber's] conduct adheres to a specific regulatory scheme?

Appellants' Br. at 2-3.

A. We decline to transfer this appeal to Commonwealth Court.

In their briefs, both parties address whether this appeal belongs in Commonwealth Court. Appellants concede that their Complaint asserts a cause of action under the Stormwater Management Act for alleged violations of the township Stormwater Management Ordinance, and therefore "draws into question . . . the application of a local ordinance." Appellants' Br. at 26. However, they argue that because they did not advance this theory in their Petition for Injunctive Relief, and the court did not engage in an "extended analysis" of the issue, transfer is inappropriate. Id. They add that even if jurisdiction "would more properly" lie in the Commonwealth Court, the Superior Court "may nevertheless retain jurisdiction as a matter of discretion upon hearing no objection from [D&F Lumber]." Id. at 27.

D&F Lumber responds that although the Henderson Township and Jefferson County were not parties, the lawsuit involved the application, interpretation, and enforcement of a township ordinance. They argue that

Appellants wish to avoid unfavorable Commonwealth Court precedents. D&F Lumber's Br. at 12.

The Commonwealth Court has exclusive jurisdiction in appeals from Common Pleas Courts in "[a]ll actions or proceedings . . . where is drawn in question the application, interpretation or enforcement of any . . . local ordinance or resolution. . . ." 42 Pa.C.S.A. § 762(a)(4)(i)(B). Nonetheless, our appellate jurisdiction is perfected if an appellee fails to file an objection to it on or before the last day for the filing of the record, unless we order otherwise. See 42 Pa.C.S.A. § 704(a); Pa.R.A.P. 741(a). Once our jurisdiction is perfected, we determine whether to retain jurisdiction over an appeal on a case-by-case basis. We make that determination by considering all relevant factors, such as whether: (1) the case has already been transferred; (2) our retention will disrupt the legislatively ordained division of labor between the intermediate appellate courts; and (3) there is a possibility of establishing two conflicting lines of authority on a particular subject. See Mohn v. Bucks County Republican Comm., 218 A.3d 927, 933 (Pa.Super. 2019) (en banc).

Here, because Appellees did not lodge any objection to our jurisdiction within the allotted time, our jurisdiction is perfected. We therefore need not determine whether this case draws into question "the application, interpretation or enforcement of" a local ordinance, such that jurisdiction would lie in the Commonwealth Court. We instead have considered the applicable factors and concluded that transfer is not indicated. Retaining jurisdiction will not disrupt the legislatively ordained division of labor between

the intermediate appellate courts or risk establishing two conflicting lines of authority, as we do not need to engage in an analysis of matters within Commonwealth Court's jurisdiction in order to dispose of this appeal. We will retain jurisdiction over this appeal.

### B. We Decline to Dismiss the Appeal for Failure to File Post-Trial Motions.

D&F Lumber next argues Appellants waived their appellate issues by failing to file post-trial motions. D&F Lumber cites Pennsylvania Rule of Civil Procedure 227.1, and cites precedents applying it in equity trials. D&F Lumber's Br. at 16-17. It claims the permanent injunction hearing "had all the hallmarks of a trial," Appellants "covered all issues" raised in their Complaint, and the trial court addressed all of Appellants' claims. Id. at 18. It argues that Appellants' "primary prayer for relief" was denied, and the request for money damages became irrelevant "when Appellants were unable to meet their burden of proof entitling them to the same." Id.

Appellants respond that the order at issue disposed of less than all claims in the case, and therefore was not a final order. Rather, the order denied only injunctive relief, and Appellants therefore filed an interlocutory appeal under Pennsylvania Rule of Appellate Procedure 311(a)(4).

In Wolk v. School District of Lower Merion, 197 A.3d 730 (Pa. 2018), the Pennsylvania Supreme Court addressed the role of post-trial motions in the context of an appeal as-of-right from an order granting an injunction, but where other claims are still pending. In Wolk, the plaintiffs

- 19 -

filed a complaint seeking damages and the appointment of a trustee, and seeking equitable relief "primarily in the form of court-supervised modifications of the procedures employed by the District's administrators." 197 A.3d at 732. While preliminary objections and other motions were pending, the plaintiffs filed a petition for injunctive relief seeking "immediate relief," requesting that the court enjoin the defendant from enacting any tax increase. Id. (emphasis removed). The plaintiffs did not file a trial certification or pre-trial statement as required under the local rules for a case to be trial-ready. Id. at 732-33. The defendant's response to the petition for injunctive relief "made clear . . . that it believed that the [plaintiffs] were seeking a preliminary injunction." Id. at 733.

At the hearing, the defendants informed the court that the board had enacted a tax increase the night before, prompting plaintiffs to change course slightly and ask the court to enjoin implementation of the tax increase. Id. Following the hearing, the defendant filed proposed findings of fact and conclusions of law, which "again manifested its understanding that the proceeding before the common pleas court was . . . a hearing on a request for a preliminary injunction." Id. at 733-34. The plaintiffs, however, claimed they sought a permanent, not a preliminary, injunction. Id. at 734.

The trial court "couched its ruling in terms consistent with a permanent injunction . . . while also recognizing that there had been no undertaking whatsoever to resolve all issues in the case." Id. "[A]nticipating that the order

might be construed as . . . imposing a preliminary (or special) injunction . . . the court imposed a bond upon [the plaintiffs]." Id.

The defendant appealed, "invoking [Rule 311(a)(4)], which provides that an interlocutory appeal generally may be taken as of right from" an injunction order. Id. The plaintiffs sought to quash the appeal, claiming the defendant did not preserve its issues on appeal by failing to file post-trial motions. Id.

The Supreme Court found the appeal was proper under Rule 311(a)(4), as an appeal from an order granting an injunction. See id. at 739. The Court, however, addressed whether post-trial motions were required. It explained that the better approach for determining whether post-trial motions were necessary was to focus "on the stage of the proceedings rather than whether a trial-like proceeding may have been conducted." Id. at 739-40. The Court then pointed out that Rule 227.1(c)(2) requires a party in a non-jury civil case to file post-trial motions within 10 days after the filing of "the decision," and "[w]here 'the decision' in the case has not yet issued, Rule 227.1 is not implicated." Id. at 740. The Court defined "the decision" in a non-jury case for purposes of Rule 227.1 as "the decision that disposes of all claims for relief." Id. (citing Pa.R.C.P. 1038(b)).

The Court acknowledged that challenges may arise in complex cases, "such as where claims are tried and/or considered in a divided fashion prior to any judgment." Id. It stated, however, that it had "no intention" of requiring "serial post-trial motions in such cases," stating that Rule 1038(b) –

which governs civil bench trials and provides for a "decision" that "dispose[s] of all claims for relief" – serves to prevent such a result. Id.; Pa.R.C.P. 1038(b). The Court also recognized that circumstances in particular cases may obviate the need for a "trial," such as when the court has held a hearing or hearings to address "exigencies." Id. The Supreme Court stated, however, that in such cases, the trial court should advise the parties and "clarify that post-trial motions are accordingly due." Id. at 741.

Here, the Complaint sought both injunctive relief and money damages. Two years into the litigation, Appellants filed a petition for a preliminary injunction, but the order ultimately setting a hearing listed a hearing for a "permanent injunction." Both parties at various times expressed that not all claims or requests for relief would be addressed at the hearing, and the opinion and order issued by the court addressed only the petition for an injunction. Due to the ambiguity surrounding the nature of the proceedings, and the fact that the trial court did not advise the parties that the hearing would serve as the "trial" such that post-trial motions would be necessary, we decline to find waiver due to a failure to file post-trial motions. See Wolk, 197 A.3d at 741.

C. Appellants' Substantive Issues

Appellants raise three substantive challenges to the trial court's opinion and order. They claim that the court should have granted injunctive relief based on what they term the "unrebutted, clear and credible" evidence that they believe established that the stormwater constituted a nuisance and

- 22 -

trespass and the sawmills create an air pollution nuisance. They further argue that the court erred in relying on a regulatory authority's determination when determining whether to grant injunctive relief for common law nuisance and trespass. Appellants' Br. at 2-3.

Our standard of review of an order granting or denying a permanent injunction is de novo and our scope of review is plenary. Liberty Place Retail Assocs., L.P. v. Israelite Sch. of Univ. Practical Knowledge, 102 A.3d 501, 506 (Pa.Super. 2014) (citation omitted). "[W]e must accept the trial court's factual findings and give them the weight of a jury verdict where they are supported by competent evidence." Id. (citation omitted).

"To be entitled to a permanent injunction, a party must establish a clear right to relief, and must have no adequate remedy at law, i.e., damages will not compensate for the injury." Id. at 505-06 (citing J.C. Ehrlich Co. v. Martin, 979 A.2d 862, 864 (Pa.Super. 2009). "Unlike a preliminary injunction, a permanent injunction does not require proof of immediate irreparable harm." Id.

Pennsylvania law defines private nuisance as:

> [C]onduct that is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
>
> (a) intentional and unreasonable, or
>
> (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

Youst v. Keck's Food Serv., Inc., 94 A.3d 1057, 1072 (Pa.Super. 2014) (quoting Restatement (Second) of Torts § 822).

Liability for stormwater trespasses is limited. "[T]he right of the upper landowner to discharge water on the lower lands of his neighbor is, in general, a right of flowage only, in the natural ways and natural quantities." Id. at 1073 (quoting Pfeiffer v. Brown, 30 A. 844, 845 (Pa. 1895)). If the upper landowner "alters the natural conditions so as to change the course of the water, or concentrate[s] it at a particular point, or by artificial means [ ] increase[s] its volume, [the landowner] becomes liable for any injury caused thereby." Id. (quoting Pfeiffer, 30 A. at 845) (most alterations in Youst). However, liability exists "only where the water is diverted from its natural channel or where it is unreasonably or unnecessarily changed in quantity or quality. . . ." Id. (quoting Lucas v. Ford, 69 A.2d 114, 116 (Pa. 1949)).

Appellants first maintain that the trial court's order was against the weight of the evidence. They content that their expert, Randall, "testified in unrebutted fashion as to environmental impacts to a particular piece of property." Appellants' Br. at 40. They claim only Randall performed a site-wide, comprehensive storm water analysis identifying areas of the property where water from D&F Lumber's sites invaded. They claim the report evaluated both pre- and post-construction drainage patterns. Further, they claim Randall's report and testimony explained the conditions of the property that led to the storm water impacts.

They then argue that the record does not support some of the trial court's findings. Appellants' Br. at 41. They challenge the court's findings that Stonesifer concluded most of the water emanated from Pike Road, not D&F Lumber's sawmills, and that Stonesifer found the abatement measures adequate. Appellants contend that the evidence "flatly contradicted" the claim that Stonesifer evaluated whether the sawmills adversely impacted Appellants' property. Appellants argue Stonesifer's testimony shows he evaluated the sawmills' compliance with the regulatory schemes, not their impact on Appellants' property. They point out that Stonesifer testified that he was "not really involved" in evaluating whether a common law trespass happened. Id. at 42 (citation omitted).

They further claim that Stonesifer's testimony about stormwater controls was limited to a discussion of a sediment trap on Miller's property and the source of discharges onto Pike Road. They maintain that Stonesifer "did not address, much less contradict, anything Randall put into evidence regarding impacts to other areas of the Adams property." Id. Appellants conclude that "the trial court's finding that the Sawmills are not responsible for the flooding and erosion experienced by [Appellants] flies in the face of competent, credible, and unrebutted expert testimony, and accordingly is not supported by substantial evidence." Id. at 43. They claim Randall's credible and unrebutted testimony established that the water "unreasonably and unnecessarily changed in quantity [and quality]," the invasions were due to

intentional conduct, and the inundation would harm a person of reasonable sensibilities. Id.

D&F Lumber replies that, contrary to Appellants' contention, a court need not accept the testimony of an expert, even if unrebutted. Further, they contend the record contains testimony from "individuals who could be considered independent expert witnesses," including an inspector for the DEP Air Quality Program, Justin Rogers, a district manager for the Jefferson County Conservation District, Shaun Wassell, and a Water Quality Specialist for Pennsylvania, Clint Stonesifer, and that such testimony contradicted Randall.

We disagree with Appellants that a fact-finder must agree with unrebutted expert testimony. Rather, "the fact-finder is free to accept or reject the credibility of both expert and lay witnesses, and to believe all, part or none of the evidence." Gunn v. Grossman, 748 A.2d 1235, 1240 (Pa.Super. 2000) (citing Gaydos v. Gaydos, 693 A.2d 1368 (Pa.Super. 1997).

Here, the trial court concluded:

> [T]he credible evidence does not support [Appellants'] position that [D&F Lumber is] responsible for the water that floods their property at times. Given Ms. Adams' poorly veiled animosity toward [D&F Lumber] and some of [its] associates, as well as her denial that she ever admitted that her own spring was discharging water onto Pike Road, her opinion on the matter is highly suspect. Mr. Randall did not evidence the same bias, of course. Weighed against the testimony of a trained and experienced DEP water quality specialist who draws a paycheck from the entity whose regulations he is instructed to enforce, however, his opinion is unconvincing. The Court is thus satisfied that the measures H3 and D&F have implemented to manage the stormwater on their own properties have in fact protected

[Appellants'] Property from being inundated by it. Clearly [Appellants] have experienced flooding on their property. What is not clear, however, is that [D&F Lumber is] to blame.

Trial Ct. Op. at 8-9 (footnote omitted).

The court's factual findings and credibility determinations are supported by the record, and it did not err in finding Appellants failed to establish that any flooding on their property was due to D&F Lumber's property. Although Randall testified the water flowed from the mills and caused a negative impact on Appellants' property, D&F Lumber presented testimony the water flowed from elsewhere. It was Appellants' burden to convince the court by a preponderance of the evidence that they were entitled to relief. As the trial court did not credit their evidence, they consequently failed to carry their burden.

Appellants next argue that the evidence does not support the trial court's finding that "Mr. Reed's respiratory issues predated the mills' major expansion," and "Western Pennsylvania's prevailing meteorological conditions guarantee that the levels of dust visible in the photographs comprising Exhibit 9 do not occur with the frequency [Appellants] would have the court believe." Appellants' Br. at 44 (quoting Trial Ct. Op. at 7).

Appellants concede that the court rejected some of Dr. Penek's findings as inconsistent with Reed's testimony. They maintain, nonetheless, that "several aspects of Dr. Penek's opinion [were] unrebutted and independently sufficient to demonstrate that the substantial evidence establishes a casual relationship between the Sawmills' expansion and Reed's respiratory

diseases." Appellants' Br. at 45. They note Dr. Penek had Reed undergo testing to evaluate the nature of his lung impairments and relied on his training and expertise in pulmonology, noting there was a "relationship between inhalation of wood dust and chronic bronchitis and emphysema and lung cancer." Id. Dr. Penek further explained the sawmill's dust causes Reed to have coughing attacks. Id. Appellants maintain there was no competing evidence offered as to a source of Reed's pulmonary distress. They further claim no evidence supports the court's conclusion that the meteorological conditions preclude the causation theories. Id.

D&F Lumber responds that the court was not required to accept Dr. Penek's testimony, and that in any event, his testimony was not "unrebutted." D&F Lumber's Br. at 37-38.

The trial court concluded:

> The Court does not doubt that Mr. Reed suffers from a progressive respiratory disease exacerbated by dust. . . . Based on the evidence, however, the Court doubts whether [D&F Lumber is] the source of [the] problem.
>
> The credible evidence indicates that Mr. Reed's respiratory issues predated the mills' major expansion. Utilizing the timeline provided by [Appellants], Dr. P[e]nek testified that it was 2012 when the mill properties were undergoing the excavation that precipitated Mr. Reed's respiratory distress. It was then, he testified, that his client began developing asthmatic symptoms. Having not obtained medical records more than five years old, though, Dr. P[e]nek was not in a position to make that determination. Meanwhile, Mr. Reed contradicted his medical expert's timeline and proffered causation, stating plainly that he was first prescribed an inhaler after having two severe respiratory attacks in 2011—

the year before heavy excavation commenced at the mill sites.

The mills may contribute to Mr. Reed's continued respiratory decline, but only indirectly. That is to say that the dust arising from Pike Road would likely be significantly less but for the mill-related traffic. To the extent that the mills are responsible for ensuring the road's condition, however, they are doing what the Township demands of them. It is not their duty to further ensure that drivers travel at dust-minimizing speeds or that Pike Road is in a condition year round such that it will not create dust. At the same time, Western Pennsylvania's prevailing meteorological conditions guarantee that the levels of dust visible in the photographs comprising Exhibit 9 do not occur with the frequency [Appellants] would have the Court believe.

As for the wood dust, [Appellants'] testimony is simply not credible. By their account, a cartoonish dust cloud visible from a mile away regularly rises up from the mill properties on dry, windy days, travels the precise distance from there to the homestead portion of their 150 acres, and descends to cover their house and surrounding property. Improbable in and of itself, the likelihood of that scenario is further reduced by the following considerations: 1.) That [D&F Lumber has] a financial incentive to retain as much sawdust as [it] can; 2.) that it is blown directly into a designated dust bin that, excepting the brief span of time between when it was breached and repaired, keeps it contained; and 3.) that DEP personnel who was at the site more than a dozen times specifically tasked with ascertaining the mills' level of compliance with dust containment requirements never witnessed a concerning sawdust event, never felt the need to issue a violation, and only ever observed conditions he thought could lead to a violation but that were quickly remedied in accordance with his suggestions.

Trial Ct. Op. at 7-8.

The record supports the trial court's factual findings and credibility determinations, and the court did not err in concluding Appellants did not prove that Reed's respiratory ailments were caused by the operation of the

sawmills. As the court noted, Reed's condition began before the mills began increased operations, and other conditions of his housing and employment contributed to the ailments.

In their final claim, Appellants maintain the court erred in relying on regulatory determinations that the sawmills were in compliance with specific regulatory schemes. They note the trial court relied on testimony from regulators that D&F Lumber complied with relevant regulatory schemes, and argue such reliance was "inappropriate given the nature of the claims asserted." Appellants' Br. at 46-47. They argue that a court may enjoin lawful activities where they unreasonably interfere with another person's property rights, and therefore, D&F Lumber's activity could be enjoined regardless whether it complied with environmental statutes.

D&F Lumber argues the testimony from the government employees showed D&F Lumber was in compliance with the government mandates and that they were not engaged in a trespass or nuisance. It established there was no credible evidence that sawdust from the facilities was unreasonably harming Appellants or that D&F Lumber's property was the source of the water harming Appellants' property.

We conclude the court did not err in relying on testimony from government employees, who testified that D&F Lumber was in compliance with the Township Ordinance and DEP regulations. Although such evidence alone may not establish a trespass or nuisance did not occur, it is relevant evidence that supports a finding that no actionable tort exists.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/15/2021